# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs June 12, 2012

## RUSSELL CALDWELL v. STATE OF TENNESSEE

**Direct Appeal from the Circuit Court for Chester County**
**No. 08CR73     Donald Allen, Judge**

_____

**No. W2011-02652-CCA-R3-PC  - Filed June 26, 2012**

_____

The Petitioner, Russell Caldwell, pled guilty to facilitation of first degree felony murder and was sentenced to serve fifty years in the Tennessee Department of Correction.  The Petitioner filed a petition for post-conviction relief, alleging he received ineffective assistance of counsel.  After a hearing, the post-conviction court entered an order denying post-conviction relief.  Finding no error, we affirm the post-conviction court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JEFFREY S. BIVINS and ROGER A. PAGE, JJ., joined.

Jeremy B. Epperson, Pinson, Tennessee, for the appellant, Russell Caldwell.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia Lee, Assistant Attorney General; James G. Woodall, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I. Facts

This case arises from the Petitioner's participation in the stabbing of the victim and arson of the victim's home.  For this conduct, a Chester County grand jury indicted the Petitioner for first degree murder, three counts of felony murder, and aggravated arson.  On January 5, 2009, the Petitioner pled guilty to the lesser offense of facilitation of first degree murder and the remaining charges were dismissed.

## A. Guilty Plea Submission Hearing

At the guilty plea submission hearing, the State offered the following facts as a basis for the Petitioner's guilty plea:

[O]n October 24th and 25th of the year 2006 around 11:00 or midnight, the [Petitioner], Russell Caldwell, along with a codefendant, Jason Martindil, were in the home of the victim, Ms. Pauletta Trice and during that time, they did attack Ms. Trice. She was stabbed over 120 times. Some of them were slash marks and some of them being stab wounds. After her death, . . . a chair was moved over next to the body and a shirt or towel had some kind of accelerant poured on it or some type of potpourri and that was set on fire and laid on the chair with the intent to burn the house or the structure. As a result of that fire, part of Ms. Price's body was burned. Some of her clothing was burned and some of the furnishings around the house was [sic] also burned. Ms. Jamie Trice who is here, Your Honor, with the family, did come to the victim's house that morning after the homicide. She had the intent of leaving some blankets. She had left some blankets for the victim before and she noticed those blankets still in the doorway and knew something was wrong and she did open the door and go in and saw the scene and did call law enforcement and law enforcement did arrive. As a result of that, Investigator Ronnie Faulkner and Special Agent Mark Lewis with the TBI did call in the crime scene investigation team out of Nashville who collected evidence in this case. Part of the evidence, Your Honor, that they collected linked [The Petitioner] to the crime. On the body of the victim where she was laying was a potpourri bottle. That was collected and it was tested for fingerprints. [The Petitioner's] fingerprints were on that bottle. They also collected other items that contained blood spatter where it appeared [ ] the house had been searched for whatever reason. They also recovered from a table that had been turned over next to the deceased, on that table leg there was a palm print of the [Petitioner's], Russell Caldwell, in the victim's blood linking the [Petitioner] to the crime there at the time.

Early on in the investigation the police did get a tip of a vehicle that was seen at the house during the time or near the time of the homicide. It was a very distinctive vehicle and witnesses saw it where it was usually parked. They informed law enforcement of that. Investigator Faulkner and Mark Lewis did go to that [location] where they came in contact with [the Petitioner] and his codefendant Jason Martindil, along with Nicole Martindil. They lived at that house. Nicole Martindil is the wife of one of the defendants. They

2

gave an initial statement denying any knowledge. They did give a second statement in writing in more detail where they were again denying knowledge of anything at the scene.

At some point, Your Honor, they did flee to Texas. They were extradited back from Texas. While in Texas, another statement was taken from [the Petitioner] in which he did make a statement, a partly incriminating statement that if his prints were there then he must have done it. The State would produce the testimony of the father-in-law that helped [the Petitioner] and Mr. Martindil flee to Texas, Robert Parker, that during the time that they were in flight to the state of Texas, both Jason Martindil and [the Petitioner] made statements to him. [The Petitioner's] statement to him was that he recalled slashing the victim, but he did make the statement that they did not rape the victim.

. . . .

Part of the evidence also, . . . would be that the victim's bloody clothes were found in the back of the [Petitioner]'s residence. The victim's blood was on the [Petitioner]'s clothes in the garbage behind the residence where [the Petitioner] and Jason Martindil lived. That was tested and it did come back to be the victim's blood.

The Petitioner told the trial court that he wished to enter a plea of guilty and that his attorneys had reviewed the plea agreement with him. The Petitioner verified that it was his signature on the plea agreement form and that he understood the content of the form. The Petitioner agreed that, if there was anything discussed during the plea agreement that he did not understand, he would notify the trial court. The Petitioner stated that, at the time he entered his plea, he was not under the influence of any alcohol, narcotic, or medication that could impair his judgment. The trial court advised the Petitioner of his constitutional rights, and the Petitioner stated that he understood his rights. The trial court then explained to the Petitioner the rights he would be waiving in proceeding with a guilty plea. The trial court reviewed the Petitioner's sentence, and the Petitioner confirmed that he understood the sentence. The Petitioner affirmed that he was entering the guilty plea freely and voluntarily and had not been forced or pressured into accepting the plea agreement. The Petitioner expressed satisfaction with his legal representation and stated that he had no remaining questions about his plea or sentence. In reference to the Petitioner's sentence as a career offender, the trial court engaged in the following dialogue with the Petitioner:

Trial Court: "You understand you're actually pleading outside of your range in order

3

to get this charge reduced down?"

Petitioner: "Yes, sir."

Trial Court: "I'm not sure if I advised you of that earlier, but you understand you're going to be serving a higher percentage as a result of pleading to this lesser charge. Do you understand that?"

Petitioner: "Yes, sir."

The trial court then accepted the Petitioner's plea of guilt, stating:

At this time the Court finds that [the Petitioner's] decision to plead guilty here today . . . has been freely, voluntarily, knowingly and intelligently made and that there is a factual basis for the plea and also the Court finds that the [Petitioner] has had the advice of two attorneys with whom he is satisfied. The Court accepts this plea and will make the plea bargain agreement the orders of this Court.

The trial sentenced the Petitioner to serve fifty years in the Tennessee Department of Correction at 60% release eligibility status and dismissed the remaining charges.

## B. Post-Conviction Hearing

During the post-conviction hearing, the parties presented the following evidence: One of the Petitioner's attorneys, ("Counsel"), testified that the Court appointed him to represent the Petitioner in 2008. Counsel explained that the Petitioner was initially appointed a different attorney ("Co-Counsel"). Thereafter, the State filed a notice of its intent to seek the death penalty, and the trial court appointed him as "lead counsel" in addition to Co-Counsel to represent the Petitioner.

Counsel testified that he could not recall the exact number of times he met with the Petitioner, but they met "several" times. Counsel said that he reviewed all of the State's evidence with the Petitioner and discussed the case until he believed the Petitioner understood the evidence against him and the potential defenses. Counsel said that he intended to present a diminished capacity defense at trial. In preparation, he hired a psychologist, Dr. Lynn Zager, who was of the opinion that, due to the medication and alcohol the Petitioner consumed earlier in the day, the Petitioner was in a "black-out" state during these events. Counsel presented Dr. Zager's report to the State who also hired an expert witness to examine the Petitioner. The State's expert witness agreed with Dr. Zager's

4

conclusion that the Petitioner did not have an adequate memory of the events.

Counsel testified that the Petitioner's trial date was set for January 2009. During voir dire, the parties reached a plea agreement for the Petitioner's charges. The trial court took a recess during the jury selection to allow Counsel and Co-Counsel to review the plea agreement with the Petitioner. Counsel said that he "carefully went through the plea agreement as it was proposed and explained the status." Counsel recalled that the plea offer required the Petitioner to plead guilty out of range, but it removed the possibility of a death sentence. Counsel said he discussed the range, potential sentences if the Petitioner was convicted by a jury, and the weight of the evidence against the Petitioner. Counsel said that he believed it was in the Petitioner's best interest to accept the State's plea offer because the State's offer was similar to what he projected a "good result" at trial would have been and the offer removed the possibility of the death penalty.

Counsel testified that, as a part of the plea agreement, the Petitioner accepted a fifty-year sentence with a 60% release eligibility status. Counsel said that, had the Petitioner been sentenced within his sentencing range, his release eligibility status would have been 35% or 45%. Counsel said that he explained to the Petitioner what it meant to plead out of his sentencing range, and the trial court also explained it to the Petitioner as part of the plea hearing. Counsel said that he told the Petitioner that, even though the Petitioner did not have a specific memory of the events, there was adequate proof that the Petitioner was present at the crime scene. Counsel recalled that the Petitioner's fingerprints were found on the bottle used as an accelerant for the fire, and the Petitioner's palm print in the victim's blood was found on the table. Further, the co-defendant was prepared to testify that the Petitioner was present and used the knife to stab the victim.

Counsel testified that the Petitioner was "very engaging" and questioned different aspects of the State's plea offer. Counsel said that he would not have proceeded with a guilty plea hearing if he had not believed that the Petitioner understood the plea offer and the submission of a guilty plea.

On cross examination, Counsel testified that he made it "very clear" that the probability of the death penalty was a "real possibility" based on the State's evidence. Counsel agreed that the first "firm offer" from the State was made during jury selection. Counsel agreed that he had full access to all of the State's evidence in this case. Counsel identified numerous motions, some of which were granted and some denied, filed on the Petitioner's behalf before trial.

Counsel testified that the Petitioner maintained that he did not have a memory of any of the events of his crimes. Counsel said that he filed a motion to have an expert appointed

5

to examine the Petitioner. Counsel identified his notice of intent to present a diminished capacity defense as required by the Tennessee Rules of Criminal Procedure. Counsel agreed that the trial court complied with all of the requirements of Rule 11 for the acceptance of guilty pleas. Counsel testified that he and Co-Counsel were prepared to proceed with a trial when the Petitioner chose to accept the State's plea offer. Counsel said he believed that the Petitioner was "fully informed" when he made the decision to plead guilty.

Co-Counsel testified that the trial court appointed him to represent the Petitioner in a murder case. Counsel said that he "visited" with the Petitioner "often." He said he met with him at every court appearance and made "many trips" to the jail to meet with the Petitioner. Co-Counsel described the Petitioner as "very polite, well mannered and very inquisitive about his case." Due to the longevity of death penalty cases, Counsel said he liked to build a relationship with his clients. He said that he "got to know [the Petitioner] quite well and genuinely liked him."

Co-Counsel testified that both he and Counsel reviewed the State's offer with the Petitioner, which included a discussion about the Petitioner pleading outside of his sentencing range. Co-Counsel said that, pursuant to the agreement, the Petitioner was sentenced as a career offender with a 60% release eligibility date. Co-Counsel said that the facts of the case were particularly "gruesome." He projected that, under the "best case scenario" at trial, the Petitioner would have received thirty-seven years at 100%, which would be similar to the date of release in the State's offer. Contrary to Counsel's testimony, Co-Counsel said that the State originally made an offer of a life sentence plus eight years that the Petitioner declined.

On cross examination, Co-Counsel testified that he believed the Petitioner had a full understanding of his guilty plea. Co-Counsel said that both he and the trial court explained to the Petitioner that he was pleading outside his sentencing range in exchange for removing the possibility of the death penalty as a sentence.

The Petitioner testified that his attorneys "did the best they could" but that Counsel and Co-Counsel could have "tried to get me a little bit better." The Petitioner said that Counsel and Co-Counsel met with him "quite frequently" and "explained everything to me." The Petitioner said that his main complaint is that he pled outside his sentencing range. Additionally, he stated that he pled guilty under duress because he was "under the impression that if [he] didn't take the plea they were going to kill [him] for sure."

The Petitioner testified that Counsel and Co-Counsel reviewed the State's offer with him, and the trial court reviewed it again in the courtroom. The Petitioner said he asked many questions about the sentence and both Counsel and Co-Counsel answered those

questions, but he was "trying to take anything but life or death." He said he was relieved at the time of his plea to "get away" from the death penalty. Subsequently, he did some research and now believed he had received an illegal sentence because his sentence was enhanced outside his sentencing range. The Petitioner explained that he had only a felony conviction for burglary and a felony conviction for forgery and yet he was sentenced as a career offender, which required seven prior convictions.

On cross examination, the Petitioner testified that he wanted a sentence within the appropriate range provided by law. The Petitioner agreed that Counsel and Co-Counsel did everything they could outside of getting a better release eligibility percentage on his fifty-year sentence. The Petitioner agreed that he understood the rights and sentence as explained by the trial court at his guilty plea submission hearing but explained that, at the time, he "was happy to get away from the death penalty."

Based upon this evidence, the post-conviction court dismissed the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner concedes that he received adequate representation from Counsel and Co-Counsel, but he maintains that he did not sufficiently understand his guilty plea as explained by his attorneys. Due to Counsel's alleged failure to explain to the Petitioner his rights and the process, the Petitioner asserts that he was prejudiced in that his guilty plea was not knowing and voluntary. The State responds that the post-conviction court properly concluded that the Petitioner's trial counsel provided effective assistance. We agree with the State.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon our review, the trial judge's findings of fact are given the effect and weight of a jury verdict, and this Court is "bound by the trial judge's findings of fact unless we conclude that the evidence contained in the record preponderates against the judgment entered in the cause." *Black v. State*, 794 S.W.2d 752, 755 (Tenn. Crim. App. 1990). Thus, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial court, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999)*; Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's conclusions of law, however, are subject to a purely

7

de novo review by this Court, with no presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457 (Tenn. 2001).

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland*, 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of

counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating the knowing and voluntary nature of a guilty plea, the United States Supreme Court has held that "[t]he standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). The court reviewing the voluntariness of a guilty plea must look to the totality of the circumstances. *See State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995); *see also Chamberlain v. State*, 815 S.W.2d 534, 542 (Tenn. Crim. App. 1990). The circumstances relevant to a guilty plea include:

> the relative intelligence of the defendant; the degree of his familiarity with criminal proceedings; whether he was represented by competent counsel and had the opportunity to confer with counsel about the options available to him; the extent of advice from counsel and the court concerning the charges against him; and the reasons for his decision to plead guilty, including a desire to avoid a greater penalty that might result from a jury trial.

*Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993) (citing *Caudill v. Jago*, 747 F.2d 1046, 1052 (6th Cir. 1984)). A plea resulting from ignorance, misunderstanding, coercion, inducement, or threats is not "voluntary." *Id.*

"Whether a guilty plea meets the constitutional standards of voluntary and knowing

9

is a mixed question of law and fact." *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003) (citing *United States v. Gray*, 152 F.3d 816, 819 (8th Cir. 1998)). This Court reviews mixed questions of law and fact de novo with a presumption of correctness "given only to the post conviction court's findings of fact." *Id*. (citing *Fields*, 40 S.W.3d at 458).

In denying relief, the post-conviction court made the following findings:

You know, I don't really credit his testimony here today when he says he didn't understand how he could get a higher range than Range 2, but I did advise him he was going to be sentenced at 50 years at 60 percent to serve and he understood that and that's what he agreed to accept.

So when I look at the totality of all of these circumstances that I've talked about, I have to certainly look at the [Petitioner's] familiarity with the criminal process. As I said, this wasn't the first time he had pled guilty before a court. I can tell as I mentioned, I think he is a very intelligent man.

. . . .

Based upon all of this, the Court finds that the [Petitioner] did in fact freely, voluntarily, knowingly and intelligently enter his guilty plea. I don't find that counsel committed any errors. I don't think even [the Petitioner] believes [Counsel] or [Co-Counsel] committed any errors. I think he's just hoping perhaps he could have gotten a little less percentage than what he did, but certainly they did a very good job of representing him. They perhaps kept him from at least the potential of receiving the death penalty. . . . It was some pretty severe facts that he was facing in this case, and I think the death penalty was at least a very good possibility he may have received that had he gone to trial.

So, I'm going to deny the Petition for Post Conviction Relief. The Court finds that [the Petitioner] has failed to prove but for [Counsel] or [Co-Counsel's] alleged actions that he would have not otherwise pled guilty. I think he took the option that he wanted to take. He wanted to avoid the death penalty. He [ ] didn't mind serving 50 years. He even told me that today that he didn't mind serving 50 years, he just wished he could have gotten a little bit better percentage. That certainly does not entitle him to post conviction relief.

The Petitioner describes Counsel's and Co-Counsel's alleged failure to "properly"

10

advise him of pleading guilty "outside of his range" as a "material deficiency." We conclude that the Petitioner has not proven by clear and convincing evidence that Counsel or Co-Counsel was deficient in this regard. The record reflects that both Counsel and Co-Counsel reviewed the State's offer with the Petitioner and answered his questions. The Petitioner testified that his attorneys "explained everything to [him]" and answered his questions, but he pled guilty to avoid the death penalty. The trial court also reviewed the sentence with the Petitioner and specifically asked the Petitioner if he understood and agreed to plead guilty outside his sentencing range in exchange for a reduced charge. The Petitioner answered affirmatively and told the trial court that he had no questions about his sentence. Accordingly, Counsel and Co-Counsel's performance in relaying the State's offer and explaining the sentence did not fall below an objective standard of reasonableness. To the contrary, from the record, it appears that Counsel and Co-Counsel were thorough in their work with the Petitioner.

Further, the Petitioner cannot prove that he was prejudiced by Counsel or Co-Counsel's explanation of the sentence because the trial court also reviewed the sentence with the Petitioner. The Petitioner stated that he tried to "get away" from the death penalty, which his attorneys successfully negotiated as part of the plea agreement.

Accordingly, the trial court did not err when it concluded that Counsel and Co-Counsel rendered effective assistance of counsel. The Petitioner has not proven by clear and convincing evidence that Counsel and Co-Counsel were ineffective or that he was prejudiced by their representation. Thus, the Petitioner is not entitled to relief.

### III. Conclusion

After a thorough review of the record and relevant authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE